# EXHIBIT B



**COLLIN COUNTY**

Lynne Finley
District Clerk
2100 Bloomdale Road, Suite 12132
McKinney, Texas 75071
(972) 548-4320
972-424-1460 Ext. 4320 (Metro)

CASE NO: 429-01028-2022

Certified Copy Verification (Electronic)

BKL Holdings, Inc. vs. Globe Life Inc., American
Income Life Insurance Company, Liberty National
Life Insurance Company, Family Heritage Life
Insurance Company of America, James E "Bo"
Gentile, Jr., and David Zophin

In the 429th District Court

Of Collin County, Texas

STATE OF TEXAS
COUNTY OF COLLIN

I, Lynne Finley, District Clerk in and for Collin County, Texas, do hereby certify that the attached
document is a true and correct copy of the original document as the same appears on file in the District
Court, Collin County, Texas.  Witness my hand and seal of said Court, on this the 3rd day of March, 2022.

ATTEST: Lynne Finley, District Clerk

By: _____, Deputy
Lana Sikes

DOCKET SHEET

# DOCKET SHEET

## CASE NO. 429-01028-2022

| | |
|---|---|
| BKL Holdings, Inc. vs. Globe Life Inc., American Income Life Insurance Company, Liberty National Life Insurance Company, Family Heritage Life Insurance Company of America, James E "Bo" Gentile, Jr., and David Zophin § § § § | Location: **429th District Court** <br> Judicial Officer: **Willis, Jill Renfro** <br> Filed on: **03/02/2022** |

---

### CASE INFORMATION

Case Type: **All Other Civil Cases**

---

| DATE | CASE ASSIGNMENT |
|---|---|

**Current Case Assignment**

| | |
|---|---|
| Case Number | 429-01028-2022 |
| Court | 429th District Court |
| Date Assigned | 03/02/2022 |
| Judicial Officer | Willis, Jill Renfro |

---

### PARTY INFORMATION

| | | *Lead Attorneys* |
|---|---|---|
| **Plaintiff** | **BKL Holdings, Inc.** | **Winn, Richard W** <br> *Retained* <br> 972-788-1400(W) |
| **Defendant** | **American Income Life Insurance Company** | **Pro Se** |
| | **Family Heritage Life Insurance Company of America** | **Pro Se** |
| | **Gentile, James E "Bo", Jr.** | **Pro Se** |
| | **Globe Life Inc.** | **Pro Se** |
| | **Liberty National Life Insurance Company** | **Pro Se** |
| | **Zophin, David** | **Pro Se** |

---

| DATE | EVENTS & ORDERS OF THE COURT | INDEX |
|---|---|---|
| 03/02/2022 | Plaintiff's Original Petition (OCA) $371.00 <br> Party:  Plaintiff  BKL Holdings, Inc. | |
| 03/02/2022 | Request for Citation $8.00 | |
| 03/02/2022 | **Citation** <br> Globe Life Inc.          unserved <br> American Income Life Insurance Company          unserved <br> Liberty National Life Insurance Company          unserved <br> Family Heritage Life Insurance          unserved | |

# DOCKET SHEET
## CASE NO. 429-01028-2022

Company of America

Gentile, James E "Bo", Jr.                unserved

Zophin, David                             unserved

| DATE | FINANCIAL INFORMATION |
|------|----------------------|

**Plaintiff** BKL Holdings. Inc.

Total Charges                                    419.00
Total Payments and Credits                       419.00
**Balance Due as of  3/3/2022**                  **0.00**

*Printed on 03/03/2022 at 8:00 AM*

Filed: 3/2/2022 3:12 PM
Lynne Finley
District Clerk
Collin County, Texas
By Rosanne Munoz Deputy
Envelope ID: 62233387

429-01028-2022

CAUSE NO. _____

| | |
|---|---|
| BKL HOLDINGS, INC. D/B/A LICENSE COACH | IN THE DISTRICT COURT |
| Plaintiff, | |
| v. | COLLIN COUNTY, TEXAS |
| GLOBE LIFE INC.; AMERICAN INCOME LIFE INSURANCE COMPANY; LIBERTY NATIONAL LIFE INSURANCE COMPANY; FAMILY HERITAGE LIFE INSURANCE COMPANY OF AMERICA; JAMES "BO" E.  GENTILE, JR.; and DAVID ZOPHIN. | _____ JUDICIAL DISTRICT |
| Defendants. | |

## **PLAINTIFF'S ORIGINAL PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff BKL Holdings, Inc. doing business as License Coach ("License Coach"), and files this its Plaintiff's Original Petition in the above-entitled and numbered cause, complaining of and against Defendants Globe Life Inc. ("Globe Life"), American Income Life Insurance Company ("American Income Life"), Liberty National Life Insurance Company ("Liberty National Life"), Family Heritage Life Insurance Company of America ("Family Heritage Life"), James "Bo" Gentile, Jr. ("Gentile") and David Zophin ("Zophin") (sometimes collectively referred to herein as "Defendants"), and in support thereof would respectfully show the Court as follows:

## **DISCOVERY CONTROL PLAN**

1.      Pursuant to Texas Rule of Civil Procedure 190.4, discovery is intended to be conducted in this case under Level 3.

## **THE PARTIES**

2.      Plaintiff **BKL Holdings, Inc**., doing business as License Coach is a corporation organized and existing under the laws of the State of Louisiana.

3.      Defendant **Globe Life Inc** (formerly known as Torchmark Corporation through on or about August 8, 2019 when the corporation changed its name to Globe Life Inc) is a corporation organized and existing under the laws of the State of Delaware, and authorized by the Texas Department of Insurance to transact business in Texas, with its principal offices located at 3700 South Stonebridge Drive, McKinney, Collin County, Texas and which may be served with citation in this cause by serving its registered agent C.T. Corporation System at its registered office located at 1999 Bryan St., Suite 900, Dallas, Dallas County, Texas 75201-3136.

4.      Defendant **American Income Life Insurance Company** is a corporation organized and existing under the laws of the State of Indiana, and authorized by the Texas Department of Insurance to transact business in Texas, with its principal place of business located at 1200 Wooded Acres, Waco**,** McLennan County, Texas 79710 and which may be served with citation by serving its registered agent Joel Scarborough at its registered office located at 1200 Wooded Acres Drive, Waco, McLennan County, Texas 76799-0001. American Income Life Insurance Company is a wholly owned subsidiary of Globe Life Inc.

5.      Defendant **Liberty National Life Insurance Company** is a corporation organized and existing under the laws of the State of Nebraska, and authorized by the Texas Department of Insurance to transact business in Texas, with its principal place of business located in at 3700 S. Stonebridge Drive, McKinney, Collin County, Texas 75070, and which may be served with citation by serving its registered agent Michael R. Perkins

at its registered office located at 900 Congress Avenue, Suite 300, Austin, Travis County, Texas 78701-2432.

6.     Defendant **Family Heritage Life Insurance Company of America** is a corporation organized and existing under the laws of the State of Ohio, and authorized by the Texas Department of Insurance to transact business in Texas, with its principal place of business located in at 3700 S. Stonebridge Drive, McKinney, Collin County, Texas 75070, and which may be served with citation by serving its registered agent, CT Corporation at its registered office located at 1999 Bryan St. Suite 900, Dallas, Texas 75201-3136.

7.     Defendant **James "Bo" E. Gentile, Jr.** is an individual who may be served with citation by serving him at his residential address located at 1600 Landon Lane, McKinney, Collin County, Texas 75071-7658.   Gentile is Senior Vice President of Recruiting for the Globe Life divisions.

8.     Defendant **David Zophin** is an individual who may be served with citation by serving him at his residential address located at 12594 Blitz Drive, Frisco, Collin County, Texas.  Zophin is President of American Income Life.

## STATEMENT OF CLAIM

9.     Plaintiff seeks recovery of economic damages of more than $1,000,000.00.

## JURISDICTION AND VENUE

10.    The Court has jurisdiction over Defendants because the amount in controversy falls within the jurisdictional limits of this Court.

11.    Venue is proper in this Court because all or a substantial part of the events or omissions giving rise to License Coach's causes of action occurred in Collin County, Texas. Venue is therefore proper in Collin County pursuant to Texas Civil Practice &

Remedies Code Sec. 15.002(a)(1). Venue is also proper in this Court pursuant to Texas Civil Practice & Remedies Code Sec. 15.002(a)(3) because the principal offices in Texas of Globe Life, Liberty National Life and Family Heritage Life are located in Collin County. Venue is also proper in this Court pursuant to Texas Civil Practice & Remedies Code Sec. 15.002(a)(2) because Defendants Gentile and Zophin are natural persons who reside in Collin County, Texas. To the extent Plaintiff has established proper venue over one or more Defendants, venue is also proper in this Court pursuant to Texas Civil Practice & Remedies Code Sec. 15.005 with respect to the other Defendants in Collin County because all claims or actions arise out of the same transaction, occurrence, or series of transactions or occurrences.

## <u>STATEMENT OF FACTS</u>

12.     Defendant Globe Life Corporation formerly Torchmark is a holding company specializing in life and supplemental health insurance for middle income Americans marketed through multiple distribution channels including direct response, and exclusive and independent agencies. Globe Life has several nationally recognized insurance subsidiaries including, without limitation, Globe Life and Accident, American Income Life, Liberty National Life, United American and Family Heritage. Globe Life distributes products primarily through exclusive agencies and direct-to-the-consumer marketing.  Globe Life's sales growth is highly dependent on agent growth.

13.     Individuals wishing to sell life and/or health insurance products must be licensed in the state or jurisdiction in which they plan to do business. In order to become licensed, an applicant must pass an entry level exam testing their knowledge of insurance concepts, policies, state and federal laws and regulations, and the statutory and ethical roles and duties of the applicant as an insurance producer. Exams vary by testing provider

and state or jurisdiction. The License Coach software platform provides the training tools for an applicant to master the applicable state concepts and familiarize themselves with the testing format. License Coach provides a life, health or a combination of both life and health insurance courses in all states and jurisdictions.  The courses are designed using each jurisdiction's specific requirements with a content outline, ensuring complete coverage of all testable information. The state of the art delivery presentation, dynamic user experience and interactive tools of License Coach ensure success for every individual's learning level and style. Each applicant has immediate access to, among other things: a) an online study manual including study guides and recommendations; b) industry leading streaming video; c) unlimited chapter quizzes, online flashcards and printable cram sheets;  d) unlimited simulated exams designed specifically for the testing provider for each specific state or jurisdiction; e) downloadable audio library;  f) social media motivational tools and reward systems including the "Buddy System"  and "Badges"; g) interactive study plan and calendar; h)  student dashboard; i) testing center hyperlinks;  j) state specific exam breakdowns; k) automated certificates of completion; and l) Spanish language capability. License Coach's confidential and proprietary system also includes integrated e-signatures, knowledge base, customer support and government integrations. License Coach offered customizable Dashboard and Report Layouts to each of the Torchmark entities which could generate links for News, Summary Matters, Student Highlights, Leaderboards and a Full Student List. The foregoing confidential and proprietary information and materials were developed by License Coach only after the expenditure of considerable time, labor, skill, money and resources over at least ten years and has given License Coach a valuable economic and competitive advantage in the pre-licensing testing and training industry.

14.     Globe Life employs an exclusive and independent tiered agencies distribution network and career track which it promotes to applicants interested in becoming agents and which it describes as the "ladder of success" and "Opportunity Unlimited". The "ladder of success" includes several different levels of insurance agents generally referred to as agents, supervising agents, general agents, Master General Agents ("MGAs") and State General Agents ("SGAs").

**Master General Agent**

The Master General Agent, or MGA, works with Regional and State General Agents to build small teams of General Agents, field-train new Agents, and identify potential candidates for supervising agents or MGA roles.

**State General Agent**

The State General Agent, or SGA, is the highest level attainable with Globe Life. SGAs recruit, contract, and train all levels of Agents, and groom them for leadership roles.

The State General Agent("SGAs") is the highest level on the "ladder of success" and according to the representations of Globe Life, a SGA can earn from $500K-$3.5M+ unlimited annual earning potential.

15.     Globe Life employs a "bait and switch" method[1] to recruit agents which is the lifeblood of insurance companies such as Globe Life. For example, Globe Life's largest

---

[1] In **Joh v. American Income Life Insurance Company,** Case No. 18-cv-06364-TSH, 2021 WL 66305 (N. D. Calf Jan. 7, 2021), the Court recently approved a class action settlement in a case wherein the class alleged: Plaintiffs in this action are former insurance salesperson trainees or agents of American Life Insurance Company ("AIL"), who trained and worked at locations in California. Plaintiffs allege that as prospective AIL agents, trainees would undergo training that lasted one week or more without earning a commission or otherwise being paid. Sec. Am. Compl. ("SAC") ¶ 18, ECF No. 30. They allege that AIG promised prospective agents salaried positions, but then hired them as commission-only employees, and failed to pay or reimburse them while they worked as sales agents. *Id.* ¶ 42. They allege that as trainees and agents they were not paid a minimum wage or overtime pay, did not receive proper meal and rest breaks, and had to pay their own work-related expenses. *Id.* ¶ 20.

distribution channel is American Income Life.  The lack of growth in agents selling their products results in a lack of projected sales growth. Therefore, Globe Life spends millions to identify potential insurance agents by buying resumes from job websites like Monster.com. Reportedly, Globe Life brings in 8,000 new recruits a month utilizing this method. Globe Life then arranges "job interviews" as if these recruits were going to be employed by Globe Life. However, during the interview process, recruits are informed that the positions are for commissions only positions. As described above, in order for such recruits to sell insurance in a particular jurisdiction, such recruits must be licensed by the applicable state.  Globe Life and its SGAs inform the recruit that in order to pass the state exam, the recruit needs to purchase pre-license training and testing courses from an approved pre-licensing testing and training vendor.  Recruits believe they are being interviewed for a real job but at the last minute are told that the position is an independent contractor commission-only position.

16.      License Coach originally began working with Liberty National Life and United American, which at the time were divisions of Torchmark, predecessor to Globe Life. After becoming one of Torchmark's approved pre-licensing vendors, License Coach worked closely with Mr. Jay Politi (Senior Vice President of Operations), who oversaw the national field office, in creating custom reporting and refining trainee progress monitoring.

17.      Due to License Coach's success with Liberty National Life and a few American Income Life offices, License Coach came to the attention of Mr. Robert Falvo, the Executive Vice President of American Income Life who directed recruiting and training and later managed the day-to-day operations of American Income Life.  License Coach began by working in some test markets with Mr. Falvo monitoring License Coach's

performance. Mr. Falvo, subsequently, forwarded an email to all American Income Life

SGAs recommending License Coach and stating:

> Some of you on this email are already working with License Coach.com and getting great results and some of you are just hearing about them from other SGAs. That being said I emailing (sic) you all because I believe they have a great product that can help you improve your hire to code ratio properly.

> As SGAs and as a company one of the greatest areas of opportunity we have is reducing the Hire to Code Ratio. Same work and effort for INCREASED codes and ALP.

> With all on this test we will monitor results for May, June & July and when it works like I believe it will we will want to move more and more SGAs to this successful system.

Mr. Falvo especially approved of License Coach's reasonable price of $49 for testing and

training courses since many of the recruits were unemployed and often had very little

disposable income. A higher pre-licensing testing and training cost is a barrier to adding

new insurance agents. License Coach worked closely with Mr. Falvo to meet his goal of

increasing the "Hire to Code Ratio" to "at a minimum 3 to 1 Hire to code ratio" which

means that for every 3 applicants recruited to enroll in the pre-licensing testing and

training, Torchmark would be able to increase agent count by 1.

    18.    License Coach also met with Martin Groves (who at the time was Vice

President of Field Operations for both American Income Life and Liberty National Life)

with the anticipation of adding more SGA offices. License Coach grew quickly starting

with about 70 recruits and finishing with 7500 recruits with American Income Life by the

end of the first year and anticipated further growth in market share during the following

year with both American Income Life and Liberty National Life. The opportunity for

growth was huge, with Mr. Falvo pushing for 10,000 agents.

19.    On January 8, 2014, Bo Gentile introduced himself as the new Vice President of Recruiting for American Income Life and requested information concerning which SGAs were using License Coach's services and the number of paid-enrollments per week. Mr. Gentile wrote that he was putting together a "best practice" which would include "schools that SGAs can use".  At the same time that Gentile claimed to be "leveling the playing field" for all training and testing providers, Gentile was strongly promoting and pressuring the SGA's to switch to Xcel Testing Solutions, LLC ("Xcel Testing").

20.    On November 14, 2014, Gentile notified License Coach that he was Vice President (of Recruiting) for both American Income Life and Liberty National Life. Subsequently, Gentile would become Vice President of Recruiting for all Torchmark and, later, Globe Life Inc's divisions after its name change.

21.    In April 2017, Gentile requested that License Coach prepare a presentation of its systems and technology including its "Key Differentiators" for his consideration.  On April 18, 2017, License Coach forwarded to Gentile the following attachments:

    a)    License Coach Key Differentiators

    b)    Demo Deck-REVISED April 2017

The Course Introduction in the Demo Deck, starting with the initial login, orients and guides the student through the prelicensing process by a) describing how the system works, b) introducing the Study Plan and c) providing state specific information and links to state government and testing center sites.  The foregoing documents were tendered to Gentile with the following Confidentiality Notice:

Confidentiality Notice: This e-mail and any attachments may contain confidential information intended solely for the use of the addressee. Our LEGAL DEPARTMENT reminds if the reader of this message is not the intended recipient, any distribution, copying, or use of this e-mail or its attachments is prohibited. If you received this message

in error, please notify the sender immediately by e-mail and delete this message and any copies. Thank you, License Coach.

(the "Confidentiality Notice")

22.     Subsequently on May 8, 2017, Gentile further emailed, and had conversations with License Coach representatives, inquiring whether License Coach had any interest in bidding for all of Torchmark's business based on a monthly fee.  Gentile demanded and represented that in order for License Coach to be considered as an approved pre-licensing vendor a) License Coach must provide Gentile with client lists, prospective client lists, details concerning License Coach's business (number of students, white-labeling[2] for websites, recruiting techniques) and software platforms and reports and b) Torchmark would need access this proprietary, confidential and sensitive materials and information prior to May 19, 2017 so that he would have time to review such information and materials prior to Torchmark's meeting on May 23, 2017. Also on May 8, 2017, Gentile forwarded License Coach's "Key Differentiators" to Torchmark's management and executives.

23.     Thereafter Gentile forwarded to the competitors of Xcel Testing, including License Coach, a Request for Proposal (RFP) to bid on an exclusive pre-licensing training services for all of Globe Life's testing and training business.

24.     On May 19, 2017, License Coach submitted its "Torchmark Proposal" in response to the RFP. The foregoing Torchmark Proposal was forwarded with the Confidentiality Notice.   License Coach proposed an offer to provide pre-licensing testing

---

[2] "White labeling" occurs when the manufacturer of an item uses the branding requested by the purchaser, or marketer, instead of its own.

and training for a maximum of 8,000 students as well as offering to "white label" each website for each of the separate Torchmark brands for a monthly fee of $50,000 a month. Pursuant to Gentile's specific requests and the representations and assurances of confidentiality made by Gentile during negotiations of the RFP, License Coach shared proprietary and confidential strategic information concerning License Coach's software platform, technology and business systems and operations including customer database, customer lists, prospective customer lists, marketing strategy and material, pricing information,  building plans, business details (such as monthly enrollment numbers, website "white labeling", recruiting techniques etc.), software platforms and reports, personalized sales team meetings and overtime development and  assistance.  In addition, Gentile was given access, by restricted password,  to the License Coach website, which included :    a) an online study manual including guides and recommendations; b) industry leading streaming video; c) unlimited chapter quizzes, online flashcards and printable cram sheets;  d) unlimited simulated exams designed specifically for the testing provider for each specific state or jurisdiction; e) downloadable audio library;  f) social media motivational tools and reward systems including the "Buddy System"  and "Badges"; g) interactive study plan and calendar; h)  student dashboard; i) testing center hyperlinks;  j) state specific exam breakdowns; k) automated certificates of completion; and l) Spanish language capability. License Coach's confidential and proprietary system also includes integrated e-signatures, knowledgebase, customer support and government integrations. License Coach offered customizable Dashboard and Report Layouts to each of the Torchmark entities which could generate links for News, Summary Matters, Student Highlights, Leaderboards and a Full Student List

25.     License Coach has strict protocols for maintaining and guarding the secrecy of its confidential and proprietary information and materials including, without limitation, a) by limiting access to a small subset of employees who may log-in with the required credentials; b) requiring all employees and contractors working on or with such material to execute non-disclosure agreements; c) emphasizing the confidential nature of its business in its hiring process; d) periodically reminding employees of their obligations to keep confidential and proprietary information secret; e) closing its worksites to the public; f) password protecting all its computers; g) avoiding communicating details concerning its material information and materials in communications with clients; and h) limiting disclosure of confidential and proprietary information and materials to employees working on such information or materials.  All of the foregoing confidential and proprietary information and materials are contained on password protected computers and servers and are provided only to those with a business necessity on a need to know basis.

26.     Although Gentile had encouraged License Coach to promptly submit its RFP bid, Defendants suddenly and without any prior notice, ceased all further communications with License Coach. Gentile never responded or even contacted License Coach after the submission of the License Coach Proposal.

27.     License Coach has now learned that Gentile's abrupt and inexplicable cessation of negotiations with License Coach was part of a systematic effort by Defendants to defraud and appropriate the confidential and proprietary information and materials submitted by License Coach during the RFP process for its own subsequent commercial use.  Strategic proprietary and confidential information contained in the License Coach Proposal presented to Gentile began to appear in the marketing of Xcel Testing. In

addition, Xcel Testing adjusted its offerings, pricing and market approach to bolster its product based on the strategic proprietary and confidential information contained in the License Coach Proposal, thereby gaining a special commercial advantage (ie free-ride") because Xcel Testing was burdened with little or none of the expenses incurred by License Coach.

28.  Globe Life fraudulently failed to disclose the ownership interests of controlling persons of Globe Life in Xcel Testing which was intentionally hidden to conceal the conflicts of interests and violations of governmental regulations and laws, and company policies including a) Globe Life's Code of Business Conduct and Ethics[3]; b) Globe Life's Third Party Code of Conduct and c) the disclosure requirements to Globe Life's own investors and governmental bodies such as the of the Securities and Exchange Commission (SEC) and  the Departments of Insurance in the 47 jurisdictions in which Globe Life and Xcel Testing offer testing and training.

29.    License Coach discovered the facts alleged in the preceding paragraphs on or about March 3, 2020 as more fully explained below.   Previously, on or about August 13, 2018, Greenlight Training, Inc. (Greenlight") had filed suit against Xcel Testing (only) as the sole defendant, in New Jersey Superior Court for failing to honor Xcel Testing's contractual responsibilities resulting from an Asset Purchase Agreement wherein Xcel Testing purchased certain assets of Greenlight including insurance pre-licensing testing and training assets (the "New Jersey Litigation").  However, over 15 months later on or

---

[3] Globe Life's Code of Business Conduct and Ethics provides a lengthy prohibition of "conflicts of interest" which begins  "[a] conflict of interest exists whenever an individual's private interests interfere or conflict in any way (or even appear to interfere or conflict) with the interests of the Company" and provides examples including a) "Conflicts of interest may also arise when a director, officer, employee or contractor or member of his or her family receives improper personal benefits as a result of his or her position with the Company, whether from a third party or from the Company" and b) "It is almost always a conflict of interest for Company personnel to work simultaneously for a competitor, customer or **service provider**. Emphasis added)."

about November 21, 2019, Greenlight filed an amended complaint in which Greenlight added the owners of Xcel Testing as additional party defendants. The amended complaint exposed for the first time the true complete list of owners of Xcel Testing.   Among the defendants added in the New Jersey Litigation was Sue Warren Forbis, who is the 83-year-old mother-in-law of Defendant Gentile, Vice President of Recruiting for all Globe Life divisions, who, upon information and belief, was the true owner of the interest in Xcel Testing, which Forbis held only as nominee on behalf of, and for the benefit of Gentile. Sue Warren Forbis was from Lawton, Oklahoma, with no previous insurance experience. Another added defendant in the New Jersey Litigation was DCBTKZ Holdings, LLC which is owned and controlled by Zophin, who is President of American Income Life and former owner, with Thomas B. Williams, of the Williams Zophin Agency. As more fully discussed below, these conflicts of interest of between Globe Life and Xcel Testing were not fully disclosed to the SEC or state insurance departments either despite the intertwined nature of their ownership interests in the two companies. Plaintiff discovered the amended complaint in the New Jersey Litigation on March 3, 2020 after a representative of another company in the same industry and with common interests with License Coach emailed Mr. Brad LeBlanc of License Coach with an attachment which included the amended complaint.   License Coach then began investigating the intertwined nature of the ownership interests in Globe Life and Xcel Testing and obvious conflicts of interest.

30.    Defendants engaged in a kick-back and bribery scheme wherein Defendants, including Globe Life executives and SGAs, were making money up-front on recruits whether the recruit eventually became an agent or not. These executives of Globe Life, including, Gentile and Zophin forced SGAs to require their prospective new recruits to purchase pre-licensing testing and training from an external company, Xcel Testing for

$149. Xcel Testing kept $30 of that fee and kicked back the remaining $119 to Defendants including Globe Life executives, such as Gentile and Zophin as well as SGAs, who personally got a kick-back for every student who purchased pre-licensing testing and training from Xcel Testing. Even if the recruit never became a licensed agent or if the prospective agent never produced a single insurance sale, these executives and exclusive agencies made money because they received kick-backs and bribes from the mandated pre-licensed training required for the position.  This agent churn was good for the insiders of Globe Life who have had an undisclosed interest in Xcel Testing and were getting kickbacks and bribes from Xcel Testing to personally enrich themselves.  The kickback and bribery scheme also benefitted Xcel Testing in allowing it to grow market share by offering competitors cheaper pre-licensing testing and training. The kick-back and bribery scheme began at American Income Life nationwide but was subsequently expanded to all Torchmark and subsequently Globe Life insurance companies and/or divisions under Gentile and Zophin's direction.

31.     On or about August 7, 2019, Torchmark Corporation becomes Globe Life Inc.

32.     Defendants have actively engaged in a cover-up to hide the true ownership of Xcel Testing from the public including state insurance regulators. Multiple Globe Life executives and SGAs were secretly owners in Xcel Testing. Defendants Zophin (President of American Income Life) and Gentile (Senior Vice-President of Recruiting for all Globe Life f/k/a Torchmark) were both secretly owners of Xcel Testing as well as the principals in several large SGAs of Globe Life. Globe Life executives and SGAs did not report their ownership interest in the pre-licensing training vendor Xcel Testing and allowed Xcel Testing to fraudulently submit applications to various state departments of insurance

without disclosing such interests. Meanwhile Defendants, including Globe Life executives and SGAs, were requiring new recruits to purchase training products from a vendor Xcel Training, in which they personally owned an interest.

33.    Globe Life's exclusive distribution network recruits approximately 8,000 students monthly to become insurance agents.  By exercising their power over Globe Life's exclusive distribution network, Defendants, including Globe Life executives and SGAs, could charge above market prices to the captive recruits by requiring the pre-license testing and training at an inflated cost as a condition for the job as an agent in the insurance industry.  Xcel Testing could then sell such training products at below cost in the market to other third-party insurers in order to destroy competition and gain market share to reach their goal of selling Xcel Testing for millions.   For example, at the same time that Xcel Testing was charging the exorbitant amount of $149 to Globe Life's prospective recruits, Xcel Testing was charging Globe Life's competitors such as World Financial Group (a Transamerica company) $19 for testing and training courses. Subsequently, Xcel Testing returned to potential clients such as Globe Life's competitors, AFLAC and Banker's Life, who had initially refused Xcel Testing's highly discounted $19 testing and training and instead offered free pre-licensing testing and training courses for 6-12 months to switch to Xcel Testing. During a monthly pre-licensing review session with Aflac executives and regional managers, declared that "Xcel is free and they removed all hurdles for licensing, so they are vendor of choice." In fact, the true fair market value of the pre-licensing testing and training was probably approximately the $49 amount charged by License Coach. Defendants, including Globe Life executives and SGAs, failed to report that alternative vendors to Xcel Testing, provided similar, or superior, training programs at 5-20% of the cost of Xcel Testing. This information was not provided to state

regulators because Defendants, including Globe Life executives and SGAs, were personally splitting the difference between the $149 purchase price charged and the actual $19 cost equaling a $130/per student kickback from Xcel Testing.

34.     It has been estimated by a representative of Gentile and one of Globe Life's largest Exclusive Agencies that at least $43 million (excluding buyout $25-45 million) in bribes and kickbacks were paid by Xcel Testing to personally enrich Defendants and select Globe Life SGAs and to buy silence.  As a result of the excessive, anticompetitive $149 price tag for the pre-licensing testing and training, the growth in insurance agent development slowed precipitously which in turned slowed insurance policy sales growth and revenue.  For example, by the end of 2018 net agent growth at American Income Life had risen by only 24 net agents over 3 years to 6,894 agents despite the earlier goal of 10,000 agents. This created an environment within Globe Life in which identifying recruits to purchase pre-licensing testing and training was more profitable to the SGAs than actually getting the recruits licensed and selling Globe Life financial products. However, this environment in turn resulted in reduced revenues and stunted company growth for Globe Life.  The strategy was to gain market share and then sell Xcel Testing in which case the stock owned by insiders would be worth millions. In fact, in August 2018, Xcel Testing was purchased by Colibri Group for a reported $25-50 Million Dollars. After the sale of Xcel Testing to Colibri, Gentile and Zophin retained the tradition of bribes and kickbacks as well as licensing fraud to continue to profit and obtain holdback proceeds in order to keep the recruit numbers high until Colbri (Xcel) was sold to Gridion Capital, LLC on May 2, 2019.

35.     Globe Life selected Xcel Testing as its preferred pre-licensing training and testing provider despite knowing that Xcel Testing was non-compliant with multiple state

regulators including, without limitation, Florida, California, Washington, Illinois and Minnesota. Xcel Testing's non-compliance included allowing students to unlawfully complete or circumvent entirely the pre-licensing educational requirements of various jurisdictions.

36.     For example, the California Department of Insurance brought "Accusations" against Xcel Testing (the "California Department of Insurance Action") concerning Xcel Testing's certification as a pre-licensing education provider under the California Code. The allegations generally involved a) Xcel Testing's failure to enforce regulatory statutes for pre-licensing training which allowed Xcel Testing students to by-pass the state required 32- or 52-hour training requirements; b) Xcel Testing intentionally misled the Department of Insurance about system functionality and c) intentionally filed falsified information and data to the Department of Insurance. After conducting an audit and investigation of Xcel's education provider activities as well as interviews of Xcel's executives. "The Department's investigation revealed that XCEL allows students to complete and receive a Certificate of Completion with less than the minimum number of study hours" and found that "XCEL violated the following CCR Sections:

a.      Section 2188.2.5 subdivision (a)(2), which requires XCEL to include a methodology in the online course to ensure that students cannot complete the course in less time than the minimum period.

b.      Section 2188.5.5, subdivision (a)(1) and (b), which require XCEL to verify that a student was actively engaged in one hundred percent of an online prelicensing course and completed the total number of required training hours.

c.      Section 2188.2.5, subdivision (a)(3)(D), which requires XCEL to include an electronic component that logs the student out of the course after a period of inactivity of twenty minutes, requiring the student to log back and re-enter the course"

Based upon an additional lengthy list of Statutory Violations, the Department found, among other things, that a) "XCEL is not of good business reputation"; b) "XCEL is lacking in integrity"; (c) "XCEL knowingly, willfully, or recklessly made" misstatements in applications to the Commissioner; d) "XCEL has previously engaged in a fraudulent practice or act or has conducted business in a dishonest matter" and e) XCEL has shown incompetency or untrustworthiness in the conduct" of business. Based partly on the foregoing, the Department recommended Discipline including rescinding the Department's approval of XCEL as a prelicensing educational provider. License Coach first discovered the allegations and disclosures in the California Department of Insurance Action in or about 2019 when License Coach's founder was subpoenaed to appear in the California Department of Insurance Action. However, at the time of the subpoena License Coach had not discovered the intertwined nature of their ownership interests in the two companies, Globe Life and Xcel Testing and obvious conflicts of interest.

37.     After on or about March 3, 2020, License Coach discovered that Globe Life Executives and SGAs were personally receiving cash kickbacks and bribes for each new agent recruit that purchased pre-licensing testing and training products from Xcel Testing. The prior RFP on or about May 2017 had simply been a sham to create the façade of "best practices" and "fair-dealing" while the pre-determined winner of the RFP would be Xcel Testing which was the vendor in which these Defendants, including Globe Life executives and SGAs, had a financial ownership stake. The goal and purpose of the RFP

was simply to induce License Coach allow Xcel Testing, by and through Gentile, to wrongfully gain access, by restricted password, to License Coach's confidential and proprietary material and information for the use and benefit of its competitor Xcel Testing.

38.     One SGA reportedly made approximately $25,000 in kickbacks and bribes per month from Xcel Testing. Xcel Testing allows the SGA to keep all pre-licensing testing and training fees collected over a $6,000 per month threshold. For example, in an average month, the SGA recruits 208 prospects and charges $149.99 per student resulting in total pre-licensing revenue for the month of $31,197.92. After subtracting the $6,000 threshold, Xcel Testing sends the SGA a check in the amount of $25,197.92 for a single month of kickbacks and bribes.

39.     Further, Defendants, including Globe Life executives and SGAs, used their positions at Globe Life to prevent other vendors from competing with the same vendor, Xcel Testing, in which they had an ownership interest. Further, Defendants, including Globe Life executives and SGAs, threatened to destroy vendors who participated into the Xcel Testing investigations performed by various state departments of insurance.

40.     Xcel Testing intentionally promoted pre-licensing fraud as a competitive advantage. While on stage at a AFLAC national convention, an Xcel representative exclaimed, "other providers will not tell you this, but you can cheat your way through Xcel's course." Xcel Testing helped produce a YouTube video that detailed how a student could cheat their way through an Xcel course, and by-pass state regulations on pre-licensing requirements. One Xcel Testing representative acknowledged "We know they [ie students] are cheating, but we're going to get while the getting's good".  Also at the

same convention and on other occasions, Xcel Testing stated, "We're going to put License Coach out of business".

41.     All conditions precedent to License Coach's right of recovery for the claims asserted herein have occurred, have been waived, or have been excused.

### FIRST CAUSE OF ACTION
### *Breach of Fiduciary Duty*

42.     License Coach incorporates herein by reference the allegations contained above as if fully set forth herein.

43.     At all times relevant to this lawsuit, License Coach and Defendants were engaged in a confidential relationship.   License Coach revealed trade secrets and confidential information and materials to Defendants during the course of contractual negotiations of an agreement pursuant to the Torchmark RFP. The trade secrets and confidential information and materials were disclosed to Defendants in confidence and solely for the purpose of aiding and enabling Defendants to appraise the value and utility of License Coach's product. Defendants knew or should have known that License Coach was trying to sell its products to Defendants for the mutual benefit and business advantage of both License Coach and Defendants. Since Defendants knew or should have known that License Coach disclosed its trade secrets and confidential and proprietary information and materials in confidence during contractual negotiations, the law recognizes the existence of a confidential relationship between License Coach and Defendants.

44.     Notwithstanding its fiduciary duties and obligations, Defendants chose to advance their own business interests, as well as the business interests of third parties, including   License   Coach's   competitors,   at   the   expense   of   License   Coach   by

misappropriating License Coach's trade secrets and confidential and proprietary information and materials for its own use and benefit.

45.    Defendants' acts and omissions constitute a breach of their fiduciary duties owed to License Coach pursuant to the confidential relationship among them.

46.    As a result of the foregoing breaches of fiduciary duties, License Coach has been damaged in an amount within the jurisdictional limits of the Court, for which License Coach now sues Defendants, together with prejudgment interest thereon, post-judgment interest, and costs of Court.

47.    Defendants acted fraudulently, with malice, intentionally and with the specific intent to harm License Coach.  As a result, pursuant to Tex. Civ. Prac. & Rem. C. Sec. 41.003, License Coach is entitled to recover exemplary damages of and from the Defendants in an amount in accordance with Tex. Civ. Prac. & Rem. C. Sec. 41.008 from each of the Defendants.

## SECOND CAUSE OF ACTION
### *Misappropriation and Violations of Texas Uniform Trade Secrets Act Ch. 134A Tex. Civ. Prac. Rem. C. ("TUTSA")* **(All Defendants)**

48.    License Coach incorporates herein by reference the allegations contained above as if fully set forth herein.

49.    License Coach brings this action pursuant to the Texas Uniform Trade Secrets Act, as set forth in Chapter 134A of the Texas Civil Practice & Remedies Code.

50.    The confidential and proprietary information and materials accessed by Defendants constitute "trade secrets" pursuant to Tex. Civ. Prac. & Rem C. Sec. 134A.002(6). License Coach derives independent economic value from its confidential information and trade secrets and entrusted this information to Defendants.

51.     License Coach is the "owner" of the trade secrets pursuant to Tex. Civ. Prac. & Rem. C. Sec. 134A.002(3-a) in that License Coach is the entity in which rightful, legal, or equitable title to, or the right to enforce rights in, the trade secrets are reposed.

52.     Further, the confidential and proprietary information and materials are not generally known, or readily ascertainable by proper means, by independent investigation by the general public or persons who could wrongfully obtain economic value from their disclosure. For example, the trade secrets include certain databases that can be used to extract data and prepare reports which are specific and unique to certain customers, students, time periods and states or jurisdictions.

53.     License Coach took reasonable steps to keep its information secret by limiting the disclosure of such information only to those with a legitimate business right and need to know, requiring its computers containing such information to be password protected, and through a variety of additional methods.

54.     Defendants misappropriated License Coach's trade secrets by breaching their duties to maintain confidentiality, secrecy and strictly limited use of the information including, without limitation:

> (A)     acquisition of License Coach's trade secrets by a person who knew or had reason to know that the trade secrets were acquired by improper means; or
>
> (B)     disclosure or use of the License Coach's trade secrets without the express or implied consent of License Coach by a person who:
>
> > (i)     used improper means to acquire knowledge of the trade secrets;

(ii)    at the time of the disclosure or use, knew or had reason to know that the person's knowledge of the trade secrets was:

    (a)    derived from or through a person who used improper means to acquire the trade secrets;

    (b)    acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secrets; or

    (c)    derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret; or

(iii)    before a material change of the position of the person, knew or had reason to know that the trade secrets were trade secrets and that knowledge of the trade secrets had been acquired by accident or mistake.

With regard to Tex. Civ. Prac. & Rem. C. Sec. 134A.(A) and (B)(i) and (ii)(a) above, "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret, or espionage through electronic or other means.  Tex. Civ. Prac. & Rem. C. Sec. 134A.002.

55.    Defendants' misappropriation of the confidential and proprietary trade secrets of License Coach has injured License Coach and caused License Coach to suffer damages in an amount within the jurisdictional limits of the Court, for which amounts License Coach now sues Defendants, jointly and severally, together with prejudgment interest thereon at the highest lawful rate, post-judgment interest at the legal rate and

costs of Court. License Coach is entitled to recover damages including both the actual loss caused by the misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. Alternatively, License Coach may recover damages caused by misappropriation measured by the imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret. See Tex. Civ. Prac. & Rem. C. Sec. 134A.004(a)

56.     Defendants willfully and maliciously misappropriated License Coach's trade secrets entitling License Coach to exemplary damages in an amount not exceeding twice any award of damages. See Tex. Civ. Prac. & Rem. C. Sec. 134A.004(b).

57.     Defendants' use of Plaintiff's confidential, trade secret, and proprietary information has irreparably damaged, and will continue to irreparably damage, Plaintiffs in an amount within the jurisdictional limits of the Court. Such misappropriation has personally benefited Defendants. Based on Defendants' misappropriation of this information, Plaintiffs seek all actual damages, including Defendants' unjust enrichment, resulting from the misappropriation, as well as exemplary damages. Additionally, Plaintiffs also ask that the Court disgorge any profits obtained by Defendants as a result of the misappropriation and provide such profits to Plaintiffs.

### THIRD CAUSE OF ACTION
### *Fraud*

58.     License Coach incorporates herein by reference the allegations contained above as if fully set forth herein.

59.     Defendants made representations to License Coach which were material and false.  When Defendants made these representations, Defendants either: (1) knew

the representations were false; or, (2) made the representations recklessly, as a positive assertion, and without knowledge of their truth.

60.     Defendants gained knowledge of License Coach's trade secrets and confidential and proprietary information and materials through fraud, deceit and deceptive acts.  Defendants intentional and knowing (a) use of License Coach's trade secrets and confidential and proprietary information and materials and (b) misappropriating them for (i) their own business use, benefit and advantage, or (ii) for the business use, benefit and advantage of third parties, including License Coach's competitors, constitutes fraud.

61.     Defendants made the representations with the intent that License Coach act on them, and License Coach relied on the representations to its detriment.

62.     Defendants' misrepresentations caused License Coach injury.

63.     As a result of Defendants conduct, Defendants have proximately caused actual and consequential damages to License Coach in an amount within the jurisdictional limits of the Court.

64.     Defendants acted fraudulently, with malice, intentionally and with the specific intent to harm License Coach.  As a result, pursuant to Tex. Civ. Prac. & Rem. C. Sec. 41.003, License Coach is entitled to recover exemplary damages in an amount in accordance with Tex. Civ. Prac. & Rem. C. Sec. 41.008 from each of the Defendants.

## FOURTH CAUSE OF ACTION
### *Conspiracy*

65.     License Coach incorporates herein by reference the allegations contained above as if fully set forth herein.

66.     Defendants engaged in a combination or conspiracy seeking to accomplish an object of misappropriating, defrauding and/or breaching their fiduciary duties to License Coach with respect to the trade secrets and confidential and proprietary information and materials of License Coach.

67.     Defendants had a meeting of the minds on this object and course of action. Each Defendant committed unlawful, overt acts by openly, actively, and improperly conspiring and combining together to disclose and use Plaintiffs' trade secrets and confidential and proprietary information and materials for their own use and benefit, and the use and benefit of third parties including License Coach's competitor Xcel Testing.

68.     Upon information and belief,  Defendants committed unlawful, overt acts by obtaining and/or disclosing  License Coach's  trade secrets and  confidential and proprietary information  a n d   m a t e r i a l s   for improper purposes and without License Coach's consent.  Such acts were to benefit Defendants.

69.     License Coach suffered injury and damage as a proximate result of Defendants' actions.  Actual damages resulting from the conspiracy are not subject to precise calculation at this time but are in excess of the minimum jurisdictional limits of this Court.

## ATTORNEYS FEES

70.     License Coach incorporates herein by reference the allegations contained above as if fully set forth herein.

71.     In accordance with Tex. Civ. Prac. & Rem. Code Sec. 38.001 et seq. and Sec. 134A.005, License Coach is further entitled to recover its reasonable and necessary attorneys' fees incurred in prosecuting this action.

72.     As a result of Defendants' actions, License Coach has been required to obtain legal counsel to bring this suit. License Coach is also entitled to recover additional sums to compensate for the reasonable attorneys' fees incurred in bringing this suit, including the trial, post-judgment proceedings, successful appellate proceedings and enforcement proceedings, for which amounts License Coach now sues Defendants, jointly and severally.

**WHEREFORE, PREMISES CONSIDERED**, License Coach requests that Defendants be cited to appear and answer herein, and, that upon final hearing hereof, License Coach have judgment against Defendants for the following:

    a.    Actual damages in an amount within the jurisdictional limits of the Court;

    b.    Statutory damages including both the actual loss caused by the misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. Alternatively, License Coach may recover damages caused by misappropriation measured by the imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret. See Tex. Civ. Prac. & Rem. C. Sec. 134A.004(a);

    c.    Disgorgement damages;

    d.    Exemplary damages pursuant to Tex. Civ. Prac. & Rem. C. Sec. 41.003 in an amount to be determined by the trier of fact;

e.      Statutory exemplary damages pursuant to in an amount not

exceeding twice any award of damages for Defendants willfull and

malicious misappropriation. See Tex. Civ. Prac. & Rem. C. Sec.

134A.004(b);

f.      Reasonable attorneys' fees;

g.      Costs of court;

h.      Prejudgment and post judgment interest as allowed by law;

i.      Such other and further relief to which License Coach may show itself

to be justly entitled.

Respectfully submitted,

**FRIEDMAN & FEIGER, L.L.P.**

*/s/ Richard W. Winn*

by: _____

**Richard W. Winn**
State Bar No. 21779700
rwinn@fflawoffice.com

5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972) 788-1400 (Telephone)
(972) 788-2667 (Telecopier)

And

**Anthony L. Vitullo**
**FEE, SMITH, SHARP & VITULLO, LLP**
State Bar No. 20595500
Three Galleria Tower
13155 Noel Road, Suite 1000
Dallas, Texas 75240
(972) 934-9100 (phone)
(972) 934-9200 (fax)
lvitullo@feesmith.com

**ATTORNEYS FOR PLAINTIFF**